CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

11/13/2023
LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

DIAMOND PEERMAN, *et al.*,

*Plaintiffs*,

Case No. 6:21-cv-00060

v.

MEMORANDUM OPINION

WALTER CATRON, *et al.*,

*Defendants*.

Judge Norman K. Moon

 

In this case, two female corrections officers at Buckingham Correctional Center conducted a strip search of two visitors—Ms. Peerman, an adult, and J.T., a minor girl who was accompanying her. J.T. was eight years old at the time. A canine unit had alerted on Ms. Peerman. When corrections officers requested that she consent to a strip search if she still wished to visit the inmate, Ms. Peerman signed a consent form to the strip search. Ms. Peerman also admitted in discovery that she signed a consent form that J.T. be searched as well, and in which she represented that she was J.T.'s legal guardian. Similarly, in her application to visit the facility with J.T., Ms. Peerman had listed herself as J.T.'s legal guardian. In a bathroom that was locked to ensure their privacy and in which they were the only ones present, the two female corrections officers strip searched Ms. Peerman and J.T. The officers did not physically touch Ms. Peerman or J.T. during the search. No contraband was found. But, as it turns out, Ms. Peerman was not in fact J.T.'s legal guardian.

Ms. Peerman and J.T. subsequently brought suit against the corrections officers, contending that by subjecting them to strip searches under these circumstances, their rights under

the Fourth Amendment and state law were violated. There is no issue concerning the manner in which the strip searches were conducted—just that subjecting them to strip searches was itself unlawful. Subsequently, Ms. Peerman voluntarily dismissed her claims. Accordingly, J.T.'s claims are the only ones remaining.

This matter is before the Court on the defendants' motion for summary judgment. No clearly established law put the defendant corrections officers on notice that it was unlawful for them to conduct a strip search of a minor visitor to a prison when an accompanying adult visitor signed a consent form representing that they were the minor's legal guardian—but who turned out not to be. Because there is no genuine dispute of material fact on that issue, nor that the defendant corrections officers acted reasonably in attempting to secure consent to strip search the minor visitor, the defendants are entitled to qualified immunity and thus summary judgment on the plaintiff's Fourth Amendment claim. The defendants are also entitled to summary judgment on the plaintiff's state law claims. The Court therefore will grant the defendant's motion for summary judgment.

<u>Background</u>

On November 24, 2019, Diamond Peerman arrived at Buckingham Correctional Center ("Buckingham") to visit Jaquan Turner, an inmate incarcerated there. Turner's eight-year-old child (Plaintiff J.T.) accompanied Peerman. Dkt. 30 at 4 (¶ 1); Dkt. 44 at 3 (¶ 1). Peerman had previously submitted a number of applications to visit Turner, in which she variably represented that she was his sister, fiancée, niece, spouse, and a friend. Dkt. 30 at 4 (¶ 3); Dkt. 44 at 3 (¶ 3); Dkt. 30-1 (Sales Decl. ¶¶ 6, 7, 9, 11, 14). After she obtained approval to visit Turner, Peerman submitted an application on behalf of J.T., in which Peerman represented that she was Turner's

fiancée, and that she was J.T.'s parent or guardian. Dkt. 30 at 4 (¶ 3); Dkt. 44 at 4 (¶ 3); Sales Decl. ¶ 13. Buckingham approved the application. *Id.*

Paul Lane, a former narcotics dog handler for the Virginia Department of Corrections, was at Buckingham on November 24, 2019, screening visitors upon their arrival at the prison. Dkt. 30 at 5 (¶ 4); Dkt. 44 at 4 (¶ 4). Lane had substantial experience working with dogs, including five years working with narcotics detection dogs. *Id.* By November 2019, Lane had been working with his narcotics detection canine, Amigo, for over three years, and Amigo had successfully completed training at VDOC's Academy for Staff Development. Dkt. 30 at 5 (¶ 5); Dkt. 44 at 4 (¶ 5).

On November 24, 2019, while Lane was screening visitors to Buckingham, the canine "alerted" on Peerman. During the screening, the canine "alerted" on Peerman in numerous ways, including by placing his head by Peerman's feet, pointing his head toward Peerman as he was walking further down the line, pointing his tail straight out while facing Peerman, "danc[ing]" his feet, jumping towards Peerman, and finally, sitting in front of her. Dkt. 30 at 5 (¶ 7); Dkt. 44 at 4 (¶ 7).

At that time, Lane informed Defendants Officer Stovall and/or Sergeant Lawrence that the canine alerted on Peerman. Dkt. 44-1 at 18:5–10 (Lane Dep.); Dkt. 30 at 6 (¶ 8); Dkt. 44 at 4 (¶ 8). The officers directed Peerman and J.T. to stand by the front of the building. Dkt. 30 at 6 (¶ 8); Dkt. 44 at 4 (¶ 8). During this period, Defendants assert that Peerman and J.T. remained standing in front of the prison, "without direct supervision of any VDOC officer or employees, for about five minutes." Dkt. 30 at 6 (¶ 8). By contrast, Plaintiff contends that one or more officers were standing between "several feet" and "15 feet away from the pair the whole time," and were "within eyesight" of them. Dkt. 44 at 4 (¶ 8).

Sergeant Lawrence informed Officer Stovall that there was a visitor who needed to be searched, and they approached Peerman and J.T. Dkt. 30-4 at 3 (Stovall Int. Resp.); Dkt. 30 at 7 (¶ 9); Dkt. 44 at 5 (¶ 9). Sergeant Lawrence told Peerman that the canine had alerted on her, and that if she would consent to a strip search and nothing was found, she would be allowed a two-hour non-contact visit with the inmate she wanted to visit. Dkt. 30-4 at 3; Dkt. 30 at 7 (¶ 10). Peerman became upset, stating that the canine handler did not "know what the fuck they're doing and she was tired of coming to Buckingham and dealing with this shit." Dkt. 30-4 at 3; Dkt. 30 at 7 (¶ 10).[1]

While Peerman told Sergeant Lawrence that she did not need to read the consent form to her, Lawrence responded that she did and began to read it. When Lawrence got to the sentence, "[y]ou or your minor child are attempting to transport contraband into this facility," Peerman interrupted, asking whether "she" (J.T.) would need to be searched as well. Dkt. 30 at 7–8 (¶ 11); Dkt. 44 at 5 (¶ 11); Dkt. 31-3 (unredacted consent forms). Neither Sergeant Lawrence nor Stovall knew whether J.T. would have to be strip searched, so they asked their supervisor, Defendant Captain Catron. Dkt. 44-3 at 12:14-25, 21:7-19; Dkt. 44-4 at 10:1-16.[2] Captain Catron asked

---

[1] While Plaintiff stated that she "objected" to this evidence as "immaterial, and irrelevant," she did not dispute its accuracy, or provide any contrary evidence or other basis to give rise to a genuine issue of material fact. Dkt. 44 at 5 (¶ 10). *Cf. Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (explaining that "conclusory allegations or denials, without more, are insufficient to preclude" an award of summary judgment). Thus, there is no dispute of fact that could preclude an award of summary judgment, even if it were material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

[2] Stovall recalled that Sergeant Lawrence had told her that "the dog did alert on Ms. Peerman and the minor," but that she did not know whether J.T. was to be searched. Dkt. 44-4 at 10:7–11:11. For her part, Sergeant Lawrence only recalled telling Stovall that she did not know whether J.T. was to be searched, although she did testify that she believed the canine alerted on J.T. Dkt. 44-3 at 12:7–20. Regardless, neither had any first-hand knowledge of

Lane, the canine officer, whether the canine had alerted on J.T. Dkt. 44-3 at 12:18-23; Dkt. 44-4 at 10:11-16, 21. Lane told him that the canine alerted on Peerman but not J.T. Dkt. 30 at 8 (¶ 13); Dkt. 44 at 5 (¶ 13); Dkt. 30-2 (Lane Resp. to Req. for Adm. 1–3). Lane told Catron that the canine was "crittering" around J.T.—by which he was referring to an "abnormal change" in mannerisms—but that it did not alert on J.T. Dkt. 30-3 at 16:15-24, 18:13-24; *see also* Dkt. 30 at 8 (¶¶ 13–14); Dkt. 44 at 5 (¶¶ 13–14).

Captain Catron decided there was sufficient suspicion "to request consent to search the minor [J.T.] as well," based both on "the amount of interest the dog had shown on the minor child" and "considering that she was accompanied by an adult upon whom the canine had alerted." Dkt. 30 at 8–9 (¶ 15); Dkt. 44 at 5 (¶ 15); Dkt. 30-8 at 4 (Catron Interrog. Resp.). However, Catron first consulted with VDOC policy, which at that time provided that a search of a minor was allowed only if consent was obtained from the parent or guardian. Dkt. 30 at 9 (¶ 16); Dkt. 44 at 5 (¶ 16); Dkt. 30-8 at 4; Dkt. 30-7 at 12:24–13:1 (Lawrence Dep.).[3]

Catron then came back and told Peerman that a legal guardian would have to consent to the search of the minor, and he asked Peerman if she was the parent or guardian of the child, J.T. *See id.*; Dkt. 44-6 at 18:24–19:2 (Peerman Dep.). According to the corrections officers, Peerman responded either that she was, or that she was "the fucking guardian." *See, e.g.*, Dkt. 30 at 9 (¶ 17); Dkt. 30-8 at 4; Dkt. 30-4 at 4 (Stovall Interrog. Resp.); Dkt. 30-5 at 12:20-22 (Stovall Dep.): Dkt. 30-6 at 10 (Lawrence Interrog. Resp.); Dkt. 30-7 at 15:16–16:4 (Lawrence Dep.).

---

whether the canine had or had not alerted on J.T., as neither watched the search. Dkt. 44-3 at 12:11–13:4, 25:3–10; Dkt. 44-4 at 10:1–11:11.

[3] While Plaintiff objected to these facts as immaterial, she did not offer any contrary evidence, Dkt. 44 at 5 (¶ 16), and a boilerplate objection on the basis of immateriality does not suffice to create a genuine issue of material fact. *See supra* at n.1. Further still, for the reasons set forth below, the issue of consent is relevant and material to the governing legal analysis. *See infra* at 11, 17–21.

Yet, according to Peerman, she told Catron that she was not J.T.'s guardian. Dkt. 44-6 at 18:24–

19:4. In any event, however, it is undisputed that Peerman did sign two consent-to-strip-search

forms—entitled "Consent for Strip or Body Cavity Search"—one for herself and one on J.T.'s

behalf. Dkt. 44-7 at 9 (Peerman Resp. to Req. for Admissions);[4] Dkt. 45-1 at 7, Ex, 2 (discovery

request, attaching consent form); Dkt. 31-3 at ECF 21–22 (unredacted consent forms); *see also*

Dkt. 30 at 10 (¶ 22); Dkt. 44 at 6 (¶ 22) (noting dispute on basis of Peerman deposition).[5]

> The consent form includes the statement:

> I understand that I may leave the facility without submitting to the search
> indicated above and that if I leave without submitting to the additional search, my
> visit will be terminated and I will be reviewed for suspension of Visiting
> Privileges in addition to possible law violations.

> I understand that if I submit to this search and no contraband is found, I will be
> allowed to enter the facility. However, I will be limited to a non-contact visit
> during today's visitation.

> I have been informed that I may question the adequacy of the reasonable belief
> claimed for this search by filing a petition with the Facility Unit Head. If I am
> dissatisfied with the response of the Facility Unit Head, I may appeal to the
> Regional Administration.

Dkt. 31-3 at ECF 21–22; *see also* Dkt. 30 at 10 (¶ 23); Dkt. 44 at 6 (¶ 23).

---

[4] Peerman's admissions render it "conclusively established" that she signed these two consent forms. Fed. R. Civ. P. 36(b). Moreover, there has been no request that the admissions be "withdrawn or amended," *see id.*, and any such request would be denied as unwarranted and untimely.

[5] For numerous reasons, Peerman's contrary position in her deposition that she "d[idn't] even remember signing a paper for [J.T.]," and that she believed the signature on J.T.'s form was not hers, does not create a genuine issue of material fact on the issue. Dkt. 44-6 at 20:17–24. For one, she contradicted that statement elsewhere in that same deposition, when she testified that "*[w]e signed the papers* and we went inside and did the strip search." *Id.* at 18:19–20 (emphasis added). Further still, as previously stated, in her *subsequent* responses to requests for admissions, she affirmed under oath that she signed both consent forms for herself and J.T., notwithstanding any previous lapse in her memory from her deposition. Dkt. 44-7 at 9. And, in any event, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Alba v. Merrill Lynch & Co.*, 198 F. App'x 288, 300 (4th Cir. 2006) (unpublished) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

By about 11:00 a.m., Defendants Lawrence and Stovall (both female officers) and Peerman and J.T. entered a bathroom in the prison where the strip search was conducted. They were the only persons in the bathroom and the door was locked to ensure privacy. The search lasted about ten minutes. Peerman was asked to take off one piece of clothing at a time and to hand it to Stovall. She complied, and when the search was finished, she put her clothes back on. J.T. then immediately began to undress and Stovall told her to wait a minute and they would let her know what to take off. Stovall first asked J.T. to take off her shoes, and she complied. Next, she took off the rest of her clothing, one item at a time, and handed them to Stovall. She then was asked to squat and cough, and she complied. The officers did not have J.T. spread her buttocks, because they did not deem it necessary. The officers handed J.T. her clothing, and she dressed herself. No one physically touched J.T. during this procedure, and Lawrence and Stovall kept their voices calm and quiet. *See* Dkt. 30 at 11–12 (¶¶ 24–29); Dkt. 44 at 6–7 (¶¶ 24–29). No contraband was found. Peerman and J.T. were then allowed a no-contact visit with Jaquan Turner. Dkt. 30 at 2; Dkt. 44 at 1 n.2.

Peerman and J.T. subsequently filed suit against Catron, Lane, Lawrence, and Stovall. Dkt. 1. In the operative First Amended Complaint, Peerman brought one unreasonable search claim against Lane under § 1983, alleging violation of her Fourth and Fourteenth Amendment rights, and one count for gross negligence under state law. Dkt. 24 at 6–9 (¶¶ 30–51). J.T. brought four claims: including an unreasonable search against Catron, Stovall, and Lawrence, under § 1983 (Count III), and gross negligence, false imprisonment, and intentional infliction of emotional distress under state law (Counts IV–VI). *Id.* at 9–15 (¶¶ 52–89). Peerman and Lane— the only defendant against which she brought claims—filed a stipulation of dismissal. Dkt. 42.

Accordingly, only Plaintiff J.T.'s claims against Defendants Catron, Lawrence and Stovall remain pending. *See* Dkt. 44 at 1 n.1.

Defendants filed a motion for summary judgment, which has been fully briefed and argument heard thereon. Dkts. 29, 30, 44, 45. The matter is therefore ripe for disposition.

### Standard of Review

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue." *Sedar*, 988 F.3d at 761 (citing *Celotex Corp.*, 477 U.S. at 323). A non-movant's position must be supported by more than "the mere existence of a scintilla of evidence" or "conclusory allegations or denials," to "preclude granting the summary judgment motion." *Id.* (citations omitted). In ruling on summary judgment, the court must "adhere to the axiom that … '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### Applicable Law

Courts apply a two-part inquiry in ruling upon an assertion of qualified immunity at the summary judgment stage. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury … show the officer's conduct violated a [federal] right." *Tolan*, 572

U.S. at 655–56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second is whether the

right in question was "clearly established" at the time of the violation. *Id.* at 656. Courts may

address the inquiry in any order. *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018). But "[i]f

the answer to either question is no, then the official is entitled to qualified immunity." *Halcomb*

*v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021).

Qualified immunity serves to "shield[ ] [officers] from civil damages liability as long as

their actions could reasonably have been thought consistent with the rights they are alleged to

have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Thus, officers are not liable

for "bad guesses in gray areas," but rather, for "transgressing bright lines." *Maciariello v.*

*Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Qualified immunity "protects all but the plainly

incompetent or those who knowingly violate the law." *White v. Pauly*, 580 U.S. 73, 79 (2017)

(per curiam).

The Court first will set forth general principles applicable to strip searches at correctional

facilities, before proceeding under the second prong of the qualified immunity analysis, under

which this case is readily resolved.

1. *Fourth Amendment Principles*

The Fourth Amendment protects against "unreasonable searches." U.S. Const. amend IV.

The reasonableness of a search "requires a balancing of the need for the particular search against

the invasion of personal rights that the search entails." *Calloway v. Lokey*, 948 F.3d 194, 201

(4th Cir. 2020) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Courts must consider "the

scope of the particular intrusion, the manner in which it is conducted, the justification for

initiating it, and the place in which it is conducted." *Id.* (quoting *Wolfish*, 441 U.S. at 559).

The Supreme Court has applied these Fourth Amendment principles in several decisions concerning strip searches in the prison context. In *Bell v. Wolfish*, the Court held that a prison policy that required all inmates and pretrial detainees to submit to visual body cavity searches following contact visits, did not violate the Fourth Amendment. 441 U.S. at 558–60. While the Court recognized that these searches were invasive, the Court found them reasonable in view of the fact that "[a] detention facility is a unique place fraught with serious security dangers," which includes the "[s]muggling of money, drugs, weapons, and other contraband." *Id.* at 559–60. Likewise, in *Florence v. Board of Chosen Freeholders*, the Court held that, under the Fourth Amendment, a county jail could require all inmates, including those arrested for minor offenses, to submit to visual strip searches when they were being admitted to the jail's general population. 566 U.S. 318 (2012).

*Bell* and *Florence* concerned inmates and pretrial detainees; by contrast, in *Leverette v. Bell*, the Fourth Circuit addressed strip searches in the context of prison employees. 247 F.3d 160 (4th Cir. 2001). There, the Fourth Circuit concluded that while prison employees enjoy greater privacy interests than either inmates or pretrial detainees, it held that prison authorities could conduct visual body cavity searches of prison employees based on reasonable and individualized suspicion. *Id.* at 167–68. In doing so, the Fourth Circuit cited the "prison's manifest interest in preventing the introduction of drugs, weapons, and other contraband." *Id.* Finally in *Calloway v. Lokey*, the Fourth Circuit unequivocally applied that standard to prison visitors. 948 F.3d 194, 202 (4th Cir. 2022). The court held that "the standard under the Fourth Amendment for conducting a strip search of a prison visitor—an exceedingly personal invasion of privacy—is whether prison officials have reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion."

10

*Id.* Outside the prison visitor context, the Fourth Circuit has explained that because "minors are more susceptible than adults to influence and psychological damage," officials must employ "extreme caution" in "conducting sexually invasive searches of minors." *Sims*, 885 F.3d at 264.

Lastly, the issue of consent bears significantly upon this case. Generally, a search conducted without a warrant issued upon probable cause is unreasonable under the Fourth Amendment. But consent to a search provides a well settled exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Whether a search was voluntarily consented to is determined under the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). Consent to a search is valid if (1) it is "knowing and voluntary," and (2) "given by one with authority to consent." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007).

The Court will assume, without deciding, that Defendants violated J.T.'s Fourth Amendment rights in conducting the strip search of her without reasonable suspicion, based on particularized and individualized information.

2. *Qualified Immunity*

The Court therefore proceeds under the second prong of the qualified immunity analysis, and considers whether the right in question was "clearly established" at the time of the violation. To be "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). A case need not be "directly on point for a right to be clearly established," but "[s]pecificity is especially important in the Fourth Amendment context." *Id.* The right in question is "clearly established" only if "the contours of the right are sufficiently clear that every reasonable official would have

11

understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up).

The Court begins its analysis by determining "the precise right" at issue, which "must not be defined at a high level of generality but with precision." *Tarashuk v. Givens*, 53 F.4th 154, 162–63 (4th Cir. 2022). Indeed, the Supreme Court has repeatedly cautioned courts against defining the right at a high level of generality. *E.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (writing that formulation as "right to be free of excessive force" was "far too general"); *Kisela*, 138 S. Ct. at 1152 ("This Court has repeatedly told courts … not to define clearly established law at a high level of generality.") (cleaned up). Here, the Court considers the right at issue to be a minor prison visitor's right to be free from a strip search when consent is purportedly given by their accompanying legal guardian.[6]

Plaintiff argues that, at the time of J.T.'s strip search, it was clearly established that prison officials needed at least reasonable articulable suspicion to conduct a strip search of a prison visitor, including a minor. Dkt. 44 at 15–16. However, the Fourth Circuit's decision in *Calloway v. Lokey* that specifically so held was issued in January 2020, *Calloway*, 948 F.3d at 202, while J.T. was strip-searched in November 2019. Accordingly, Plaintiff relies on the earlier district court decision in that case to establish that that principle was clearly established. Dkt. 44 at 15–16. The district court concluded that, "[i]n the Fourth Circuit and elsewhere, courts have held that a strip search at a prison violates the Fourth Amendment if it is not supported at least by reasonable suspicion." *Calloway v. Brown*, No. 5:16-cv-81, 2018 WL 4323951, at *8 (W.D. Va. Sept. 10, 2018) (Dillon, J.).

---

[6] Even if defined at a higher level of generality—i.e., the right of a minor prison visitor to be free from a strip search—the outcome would be the same because the issue of consent would nevertheless still have to be considered within that framing of the right.

Defendants, however, note that the district court's decision in *Calloway* only cited unpublished decisions of the Fourth Circuit and out-of-circuit precedent, and so they argue that Plaintiff "overlooks the fundamental rule that only published opinions from the Fourth Circuit and the Supreme Court may be used to determine whether the law was clearly established." Dkt. 45 at 5. Defendants also note that the Fourth Circuit's decision in *Calloway* sought to "*now make clear* … the standard under the Fourth Circuit for conducting a strip search of a prison visitor … is whether prison officials have a reasonable suspicion, based on particularized and individualized information, that such a search will uncover contraband on the visitor's person on that occasion." *Calloway*, 948 F.3d at 202. In Defendants' view, "[i]f the law in this area was already clearly established, there would have been no need to so clarify." Dkt. 45 at 5.

Defendants are correct to look to controlling precedent in the Fourth Circuit for whether a right was clearly established. The Fourth Circuit has explained that courts should "first look 'to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose." *Tarashuk*, 53 F.4th at 164 (quoting *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017)). However, that is not the end of the matter. "In the absence of controlling authority," the Fourth Circuit has provided that it "then consider[s] 'whether the right was clearly established based on general constitutional principles or *a consensus of persuasive authority*.'" *Id.* (quoting *Thompson*, 878 F.3d at 98) (emphasis added). Indeed, the Fourth Circuit's opinion in *Calloway* cited earlier decisions from four courts of appeals that all stood for the proposition that the Fourth Amendment requires strip searches of prison visitors to be supported by reasonable suspicion, that is based on particularized and individualized information that such a search will

uncover contraband. *See Calloway*, 948 F.3d at 202 (citing decisions from the First, Fifth, Sixth, and Eighth Circuits).[7]

The Court can further assume, without deciding, that in November 2019, the law was clearly established that prison officials needed at least reasonable articulable suspicion to conduct a strip search of a prison visitor, including a minor. Even assuming that reasonable suspicion was required, Plaintiff "must demonstrate that the particular actions of these police officers were unlawful under the law established at the time of the incident." *See S.P. v. City of Takoma Park*, 134 F.3d 260, 266 (4th Cir. 1998). Plaintiff's failure to do so is fatal to her Fourth Amendment claim.

Specifically, Defendants Lawrence and Stovall's actions are protected by qualified immunity because there is no genuine issue of material fact that they each held a reasonable—if mistaken—belief that there was reasonable, articulable suspicion to strip search J.T. *See Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments"); *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (holding that "law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity"). Neither was present when the canine alerted on Peerman.[8] But it is conceded that the canine alerted on her, and that alert more than satisfied reasonable suspicion.[9] Further, neither Lawrence nor Stovall knew whether J.T.

---

[7] *See Blackburn v. Snow*, 771 F.2d 556, 564–65 (1st Cir. 1985); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995); *Hunter v. Auger*, 672 F.2d 668, 674–75 (8th Cir. 1982).

[8] Dkt. 30-4 at 3–4 (Stovall Int. Resp.); Dkt. 30-6 at 3 (Lawrence Int. Resp.).

[9] Dkt. 30 at 5 (¶ 7); Dkt. 44 at 4 (¶ 7); *Florida v. Harris*, 568 U.S. 237, 246 – 47 (2013) (explaining that after reliability testing, "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search").

was to be strip searched along with Peerman, and so they asked their supervisor, Captain Catron, who said he would speak to canine officer Lane and find out.[10] Neither overheard Captain Catron's conversation with the canine officer.[11] It is undisputed that no one told Lawrence or Stovall that the canine *did not* alert on J.T.[12] Then, when Captain Catron returned, he said that the legal guardian would need to consent to search J.T.[13] Of course, Peerman later signed the consent form—ostensibly as J.T.'s legal guardian—permitting the strip search of J.T.[14] Nor is there any dispute that it was Captain Catron's decision that J.T. was to be strip searched, with her legal guardian's consent.[15]

Under these circumstances, Defendants Lawrence and Stovall were fully entitled to rely on directions and representations from their supervisor, Captain Catron. As the Fourth Circuit described in *Calloway*, "[b]y necessity, the officers charged with maintaining safe and secure prisons must assume different roles and responsibilities and be able to rely on each other to perform their differentiated tasks." 948 F.3d at 203. Absent any good reason why Lawrence and Stovall should have doubted the response from their supervisor, they were entitled to rely on Catron's response to their inquiry whether J.T. would have to be strip searched, after Catron

---

[10] Dkt. 30-4 at 3–4 (Stovall Int. Resp.); Dkt. 30-6 at 3 (Lawrence Int. Resp.); Dkt. 30-5 at 10:1–18 (Stovall Dep.); Dkt. 44-3 at 12:14–13:1 (Lawrence Dep.); Dkt. 30-8 at 4 (Catron Int. Resp.); Dkt. 30-9 at 8:10–9:14 (Catron Dep.).

[11] Dkt. 30-5 at 11:2 – 8 (Stovall Dep.) ("I wasn't in earshot. I was still standing with the adult and the child while this information was being gathered."); Dkt. 44-3 at 12:2–6 (Lawrence Dep.) (Q. "Were you present for any of the conversations between Officer Lane and Catron?" A. "No. … I was in the area, but I wasn't there as far as to hear what was being discussed. No.").

[12] Dkt. 44 at 11–12; Dkt. 45 at 3 & n.1 (record cites).

[13] Dkt. 30-4 at 4 (Stovall Int. Resp.); Dkt. 30-6 at 3–4 (Lawrence Int. Resp.).

[14] *See supra* at 5–6 & nn.4–5.

[15] Dkt. 30-5 at 12:18–24 (Stovall Dep.); Dkt. 44-3 at 14:21–23 (Lawrence Dep.); Dkt. 30-9 at 9:10–20 (Catron Dep.).

went to ask the canine officer. *See Calloway*, 948 F.3d at 203; *see also United States v. Hensley*, 469 U.S. 221, 231 (1985) (noting that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another," and that it is unreasonable to expect officers to "cross-examine their follow officers about the foundation for the transmitted information"); *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652–53 (E.D. Va. 2010) (holding that "officers arriving on the scene in response to a call for assistance … were not required to conduct an independent investigation of the facts to come to their own determination regarding whether probable cause existed," but it was enough that the initial officer told them there was probable cause to make the arrest "and that they had no information that would cause them to question his statement") (cleaned up). So too here, there was no reason for Defendants Lawrence and Stovall to question Captain Catron's determination.

Defendants Lawrence and Stovall therefore had a reasonable, if mistaken, belief that there was reasonable articulable suspicion to strip search J.T. Moreover, nothing about the manner in which they conducted the search was unreasonable; indeed Plaintiff does not challenge the manner in which the search was conducted. The record evidence equivocally demonstrates that they conducted the strip search "in a private setting and proceeded in a professional manner." *See Calloway*, 948 F.3d at 204. Defendants Lawrence and Stovall are entitled to qualified immunity.

Although Captain Catron is differently positioned from Lawrence and Stovall, he too is entitled to qualified immunity. To be sure, Captain Catron was aware that the canine had not alerted on J.T.[16] Officer Lane told Catron that the canine had alerted on Peerman, not J.T., but

---

[16] *See* Dkt. 30 at 22 (acknowledging that Captain Catron "was admittedly aware that the canine had not alerted on J.T."); Dkt. 30-8 at 4; Dkt. 44-1 at 18:11–19:9 (Lane Dep.).

that the canine had engaged in "crittering" behavior around J.T., by which Lane meant an "abnormal change" in behavior in the "mannerisms" of the canine, but which does not rise to the level of an alert.[17] Catron has attested that, based on the interest that the canine had shown on J.T. and considering that she was accompanied by an adult upon which the canine had alerted, there was enough suspicion to request consent to strip search J.T. as well.[18] Even assuming that the change in the canine's behavior, and J.T.'s proximity to Peerman (on whom the canine *had* alerted) did not establish reasonable suspicion vis-à-vis J.T., Catron's decision whether to strip search J.T. demonstrated a reasonable, good faith effort to comply with the law rather than plain incompetence or a knowing violation of clearly established law. *See White*, 580 U.S. at 79 (qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law").

Captain Catron consulted the VDOC policy before taking action, which "allowed for the search of a minor only if consent is obtained from the parent or guardian."[19] His consultation and following of then-governing VDOC policy tends to support a showing that his conduct was not plainly incompetent or a knowing violation of the law. *Cf. Saffell v. Crews*, 183 F.3d 655, 659 (7th Cir. 1999) (reversing district court's decision to deny customs officer qualified immunity when she "could not reasonably have known that in her doing her duty and following the policies of Customs that she would be violating any law"). Catron then informed Lawrence and Stovall, the officers who would be conducting the strip search, that it should be done if J.T.'s legal

---

[17] Dkt. 44-1 at 18:11–24, 19:4–15 (Lane Dep.).

[18] Dkt. 30-8 at 4 (Catron Int. Resp.)

[19] Dkt. 30 at 9 (¶ 16). While Plaintiff objects to the issue of consent as "immaterial," *see* Dkt. 44 at 5 (¶ 16), Plaintiff does not argue that Defendants inaccurately described then-current VDOC policy. There is thus no genuine dispute of material fact on the issue.

guardian consents. And, as discussed above, Peerman admits that she signed the consent to strip search form both for herself and on behalf of J.T. *See supra* at 5–6 & nn.4–5.

Plaintiff argues broadly that consent is immaterial, and that prison officers must have reasonable suspicion to conduct a strip search of a prison visitor regardless whether such visitor consents to the search. Dkt. 44 at 5, 13–14. Plaintiff's argument fails. "A search to which an individual consents meets Fourth Amendment requirements." *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967) (citing *Zap v. United States*, 328 U.S. 624 (1946)). The constitutional touchstone of any search is reasonableness, *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977), and the Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). In other words, a search that is authorized by consent is "wholly valid." *Schneckloth*, 412 U.S. at 222.

Plaintiff's argument that consent is immaterial is largely based on a misreading of *Calloway.* Dkt. 44 at 13–14 & n.6. In that case, the plaintiff had signed a consent to search form. But, noting that the plaintiff had asserted that "she did not feel she had the choice to refuse the search," the district court "d[id] not reach the issue whether the undisputed facts establish voluntary and knowing consent." 948 F.3d at 204 n.2. The Fourth Circuit, like the district court, concluded that the officers had reasonable suspicion justifying the search, so the court simply did not have to consider consent as an alternative basis for affirmance. Nothing in either court's opinion suggested that consent was immaterial to the constitutionality of a prison official's decision to strip search a prison visitor. *See id.*; *Calloway v. Brown*, No. 5:16-cv-81, 2018 WL 4323951, at *7 n.7 (W.D. Va. Sept. 10, 2018).

18

The Fourth Amendment requires that law enforcement not "always be correct, but that they always be reasonable" in making factual determinations underlying a search. *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990). And the Supreme Court has seen "no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search." *Id.* at 186. Thus, "[a] reasonable mistake of consent is no less a factual error than relying on a facially valid warrant, or erroneously searching the wrong premises, and therefore, the proper course of action for this court is granting summary judgment on qualified immunity grounds." *Carboni v. Meldrum*, 949 F. Supp. 427, 437 (W.D. Va. 1996) (citing *Mensh v. Dyer*, 956 F.2d 36, 39 (4th Cir. 1991)). Indeed, in *Carboni*, the court similarly concluded that the defendants were entitled to qualified immunity stemming from their reasonable, but apparently mistaken, belief that the plaintiff had voluntarily consented to a strip search. *Id.* at 436–37.

To be sure, there is no dispute that Peerman is not J.T.'s guardian. But the record also discloses no genuine issue of material fact that Peerman signed the consent form for the search of J.T., upon notice that she had to be J.T.'s guardian to consent on her behalf. *See supra* at 5–6 & nn.4–5. In addition, Peerman's application for J.T. to visit Buckingham on that specific occasion, which the facility approved, identified herself as J.T.'s guardian. Dkt. 30 at 4 (¶ 3); Dkt. 44 at 4 (¶ 4) ("Undisputed."). Nor did J.T. say anything to raise doubt about whether Peerman was her guardian. Plaintiff argues that it would be unreasonable for the Defendants to rely on any statements that Peerman was J.T.'s guardian because Peerman "was 19 years old at the time." Dkt. 44 at 14. But nothing about Peerman's age and the circumstances known to the officers would tend to undermine her assertion on the form that she was J.T.'s guardian. Plaintiff also argues that the officers could not reasonably rely on Peerman's assertions on November 24, 2019, given her prior applications to visit in which she listed different relationships. *Id.* But the

officers were not unreasonable in taking Plaintiff at her consistent word with respect to that prison visit. And Plaintiff provides no authority (and the Court is aware of none) that would require prison officers to delve into past visitation log records to ensure consistency before accepting a visitor's response to a question about the legal relationship between visitors.

Plaintiff also asserts that any consent could not have been voluntary. Since the consent form provided that refusing the strip search could be grounds for termination of visitation rights, Plaintiff argues that "[a] fact-finder could find that a 19-year-old who is faced with a decision to allow the officers to strip-search them both or take away all visitation rights from the child, did not make that decision voluntarily even if she had authority." Dkt. 44 at 14. However, it is undisputed though Peerman signed the consent forms—both on her behalf and purportedly on J.T.'s behalf. *See supra* at 5–6 & nn.4–5. Further still, when Peerman told J.T. that "they" were going to make her strip, Lawrence corrected her and said that it was their decision, the officers were not making anyone strip. *See* Dkt. 30 at 10 (¶ 21); Dkt. 44 at 6 (¶ 21) (noting that this proposition was disputed but not offering any evidence to the contrary).

Moreover, Plaintiff has pointed to no controlling precedent from the Supreme Court, Fourth Circuit Court of Appeals, or Supreme Court of Virginia, that would render Defendants' actions—proceeding to strip search J.T. as a minor prison visitor following her guardian's purported consent—in violation of clearly established law. *See al-Kidd*, 563 U.S. at 741; *Tarashuk*, 53 F.4th at 164. Of course, the Fourth Circuit has required law enforcement to use "extreme caution" in conducting a sexually invasive searches of minors, but that decision did not involve prison visitation or consent by a guardian, which are both material differences in the legal and factual circumstances present here. *See Sims*, 885 F.3d at 264. In *Calloway*, discussed above, the Fourth Circuit affirmed the constitutionality of a strip search of a prison visitor based

20

on reasonable suspicion, and that case did not involve a minor visitor nor did the Court rule on the issue of consent. *See* 948 F.3d 194.

Defendants, for their part, identified three "student search" cases from the Supreme Court, none of which arose in the prison context, and none held that a guardian's consent could be invalid based upon potential repercussions from failing to consent. *See* Dkt. 30 at 26–27. Indeed, one of the cases clearly differentiated schools from prisons concerning the relative expectations of privacy. *New Jersey v. T.L.O.*, 469 U.S. 325, 328–29 (1985) (explaining that "the prisoner and the schoolchild stand in wholly different circumstances, separated by the hash facts of criminal conviction and incarceration"). Another *upheld* a random urinalysis drug testing program for student athletes against a Fourth Amendment challenge, even when the plaintiffs' parents *refused* consent. *Vernonia School Dist. v. Acton*, 515 U.S. 646 (1995). And in the last case, the Supreme Court held that strip searching a 13-year-old on school grounds for common over-the-counter pain relievers (though prohibited by school policy) was not justified, as it presented no "indication of danger to the students from the power of the drugs or their quantity," nor was there any reason to believe she had pills in her underwear. *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 376–77 (2009). Again, *Safford* did not concern prison visitation or consent from a guardian, and even in that decision the Court determined the state of the law not sufficiently clearly established and accordingly awarded the defendants qualified immunity. *Id.* at 379.

At bottom, the Court need not resolve whether Defendants' conduct violated a federal right under prong one of the qualified immunity analysis, because this case is readily resolvable under the second prong. That is, no clearly established precedent rendered Defendants' conduct unlawful at the time of such action—namely, conducting a strip search of an adult visitor to a

prison upon whom a canine had alerted after receiving the adult visitor's written consent to the search; and significantly, further conducting a strip search of a minor visitor accompanying her, upon written consent to the search by the adult visitor in which she attested that she was the minor's legal guardian. That is so even if it was subsequently determined that the adult was not in fact the legal guardian of the minor. There is no genuine dispute of material fact that the officers' determination that consent was voluntarily given by one with authority—while factually wrong—was reasonable. *Rodriguez*, 497 U.S. at 185. Moreover, their decisions to proceed with the strip search of J.T. under such circumstances were at most "bad guesses in gray areas," *Maciariello*, 973 F.2d at 298, rather than demonstrations of plain incompetence or knowing violations of clearly established law, *White*, 580 U.S. at 79. Accordingly, Defendants are entitled to qualified immunity.

   3.   *State Law Claims*

Plaintiff also brings three state law claims against Defendants, including gross negligence, false imprisonment, and intentional infliction of emotional distress. Defendants are entitled to summary judgment on these claims as well.

      a.   Gross Negligence

Turning first to gross negligence, Plaintiff admits that "gross negligence is a high bar in Virginia," but argues the claim is satisfied here. Dkt. 44 at 16. In Plaintiff's view, Defendants "showed no care" toward her. *Id.* Plaintiff contends that "Defendants had no reason to strip search J.T. in the first instance," and that Defendants Lawrence and Stovall knew, or should have known, that the canine did not alert on J.T. *Id.* Plaintiff believes that the record, when viewed in the light most favorable to her, shows that Defendants pressed forward with strip searching J.T. without confirming there was a basis to do so. *Id.* at 16–17.

22

Gross negligence is "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). It is a "heedless and palpable violation of a legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Chapman v. City of Virginia Beach*, 475 S.E.2d 798, 800–01 (Va. 1996) (internal quotation marks omitted). And while ordinarily the question whether gross negligence has been established is one for the jury, "when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established, it is the court's duty to so rule." *Elliott*, 791 S.E.2d at 732. Accordingly, "a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.* (citing *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008)).

Here, taking the evidence in the light most favorable to Plaintiff as the non-movant, each of the Defendants used at least some degree of care in ascertaining whether to strip search J.T. Significantly, Defendants Stovall and Lawrence asked their supervisor, Defendant Catron, for clarification. Dkt. 44-3 at 12:14–25, 21:7–19; Dkt. 44-4 at 10:1–16. Defendant Catron, in turn, discussed with canine officer Lane whether the canine had alerted on J.T. And while Lane told Defendant Catron that the canine had not alerted on J.T., he did say that the canine was "crittering," around J.T., i.e., exhibiting some abnormal behavior. Dkt. 30 at 8 (¶¶ 13–14 ); Dkt. 44 at 5 (¶¶ 13–14). Defendant Catron further consulted the VDOC policy, which stated that a minor could be strip searched only with the consent of the legal guardian. Dkt. 30 at 9 (¶ 16); Dkt. 44 at 5 (¶ 16). Defendant Catron conveyed to Defendants Stovall and Lawrence that J.T. was to be strip searched if she had consent from the legal guardian. Dkt. 30-7 at 12:24–13:1 (Lawrence Dep.); Dkt. 44-6 at 18:24–19:2 (Peerman Dep.). Defendants only conducted a strip

search of J.T. after Peerman signed a consent-to-strip search form on behalf of herself and J.T. Dkt. 44-7 at 9. All of these steps—including asking for direction from a supervisor, the supervisor's consultation with VDOC policy and the canine officer, and securing a signed consent to strip search form by Peerman—show that Defendants all exercised at least "some degree of care" with respect to J.T.'s rights. Plaintiff's gross negligence claim fails.

> b.   False Imprisonment

Plaintiff's false imprisonment claim fares no better. Plaintiff argues that there was no reasonable articulable suspicion to conduct the strip search "and as such no legal justification." Dkt. 44 at 17. Moreover, Plaintiff contends that a reasonable jury could find that "by telling an 8-year-old child that she cannot see her father that day, let alone that she may never see him again, unless she consents, is threat enough" to constitute a detention by "force or threats." *Id.* at 17–18.

"False imprisonment is the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). If, however, "the plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." *Id.* Moreover, Virginia law provides a defense to officers who subjectively believed in good faith, that their conduct was lawful and whose subjective beliefs were objectively reasonable. *Wingate v. Fulford*, 987 F.3d 299, 312 (4th Cir. 2021) (citing *DeChene v. Smallwood*, 311 S.E.2d 749, 751 (Va. 1984)). Indeed, the Fourth Circuit has construed Virginia's good-faith exception as "congruent with the federal qualified immunity defense." *Wingate*, 987 F.3d at 312.

Defendants Lawrence and Stovall asked their supervisor (Defendant Catron) whether J.T. was to be searched, and he conveyed to them after consulting with the canine officer that she was. Moreover, Defendant Catron consulted the VDOC policy on strip searches for minors, and Defendants Lawrence and Stovall conducted the strip search only after securing a signed consent

form from Ms. Peerman, ostensibly as J.T.'s legal guardian. There is no genuine dispute of material fact that Defendants reasonably believed they were entitled to conduct the strip search of J.T. upon that consent—though they were factually mistaken because Peerman could not so consent. Plaintiff rightly acknowledges that analysis of this claim largely "is subsumed" within the Fourth Amendment analysis. Dkt. 44 at 17. Because the Court has held that Defendant "Officers are entitled to qualified immunity" with respect to Plaintiff's unreasonable search claim under the Fourth Amendment, so too are Defendants "entitled to the good faith defense" to Plaintiff's false imprisonment claim under Virginia law. *See Wingate*, 987 F.3d at 312.

c.   Intentional Infliction of Emotional Distress

Finally, Plaintiff's intentional infliction of emotional distress ("IIED") claim similarly fails. To prove an IIED claim in Virginia, a plaintiff must establish that: (1) "the wrongdoer's conduct was intentional or reckless," (2) "the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality," (3) "there was a causal connection between the wrongdoer's conduct and the emotional distress," and (4) "the emotional distress was severe." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). IIED claims are disfavored in Virginia. *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 370 (Va. 2008).

Defendants' conduct was not "outrageous and intolerable" so as to state an IIED claim. *See Womack*, 210 S.E.2d at 148. Defendants Lawrence and Stovall asked their supervisor, and secured a consent to strip search form from Ms. Peerman, and there is no question that they conducted the search itself in a professional manner. The search was conducted in a bathroom in which only they (both female officers), Ms. Peerman and J.T. were present. The door was locked. No one physically touched J.T. while she was directed to undress. The officers' voices were calm and quiet. *See* Dkt. 30 at 11–12 (¶¶ 24–29); Dkt. 44 at 6–7 (¶¶ 24–29). Defendant

25

Catron spoke with the canine officer Lane, and learned the canine was "crittering" around J.T. though it did not alert on J.T., and Catron looked at VDOC policy and advised that a legal guardian's consent to strip search J.T. would be needed before she would be strip searched. Even assuming the facts do not substantiate reasonable suspicion that contraband would be found on J.T.—and thus, not supporting the strip search under the Fourth Circuit's decision in *Calloway*—none of the Defendant's conduct constitutes conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *See Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006). Plaintiff's IIED claim therefore also fails.

Conclusion

Because the Court has determined that Defendants are entitled to qualified immunity on Plaintiff's Fourth Amendment claim pursuant to § 1983, and that no reasonable jury could find for Plaintiff on the state law claims, the Court concludes that Defendants are entitled to summary judgment. Defendants' motion for summary judgment will be granted in an accompanying order, to follow.

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

Entered this  13th  day of November, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE